[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1269
Nature of Proceedings
On August 19, 1996, more than two years after first being placed in the custody of the Department of Children and Families (DCF) in June of 1994, Damien G., born 8/11/92, became the subject of this petition by which DCF seeks to terminate the parental rights of Donna G., his mother and sole surviving biological parent.[1] Service was confirmed on the respondent mother at the initial hearing on 9/18/96 when denials to all of the alleged grounds for such termination were entered by the mother in the presence of her court-appointed counsel. Updated psychological evaluations by the same psychologist who had evaluated mother and son shortly after his initial commitment to DCF on 9/18/94 were ordered in November of 1996 and completed in February of 1997. Trial began on 7/30/97 and was completed on 9/17/97. The parties were given until 10/15/97 for the filing of trial memoranda.
Since the original pleadings were never amended, the adjudicatory date is the original date of filing on 8/19/96. Practice Book Sec. 1042.1(4). Disposition must rest upon facts as of the final date of hearing, 9/17/97. The period of reserved decision commenced on 10/15/97.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, of which judicial notice is taken, supports the finding of the following facts:
Damien G., born 8/11/92, was the fourth out of wedlock child born to his then 29 year old unmarried mother. At the time of his birth, all three of his older half-siblings had been voluntarily placed, two years earlier, with the maternal grandmother with whom they remained. Five months after Damien was born, the maternal grandmother sought, and was granted, custody of these three older children in the Probate Court. The following year the grandmother sought DCF help in securing residential placement for the eldest child, seven years older than Damien, when behavioral problems in the school and at home, resulting from having suffered severe emotional trauma earlier in his life, made it impossible to maintain him in the grandmother's home. CT Page 1270 (Petitioner's Exh. E, p. 9.)
Although burdened with no child care responsibilities at the time of her pregnancy with Damien, Donna received no prenatal care. While consistently denying using drugs at the time, Damien was born with a positive cocaine toxicity. Nonetheless, Donna was permitted to take him home. He was placed briefly in October of 1993 by DCF at Donna's request when she had to be hospitalized for a miscarriage but was returned immediately upon her discharge. No referrals were received by DCF on this child until December of 1993 when he was found having been left alone in the home. DCF opened a protective services case at that time, but neither sought the child's removal nor initiated neglect proceedings. When again found at home without adult supervision five months later, however, DCF filed a neglect petition, but did not seek temporary custody until the time of the first hearing on that petition in June of 1994[2]. Following a subsequent trial, the child was found to have been neglected, and was committed to the custody and guardianship of DCF, for 18 months (to 3/6/96) pursuant to § 46b-129(d) of the Conn. Gen. Stats. (Rev. 1993). At the commitment hearing, the court articulated, and the mother and her counsel signed as having read, the court's expectations for her to achieve in order to be reunited with her son. These included participating in parenting counseling when offered, individual counseling if recommended by the court-ordered evaluation scheduled for the following month, and to submit to a drug and alcohol evaluation and follow any recommendation for treatment. The mother was also expected, before securing return of her child, to secure adequate housing and income source, to refrain from substance abuse, and to avoid arrests and convictions in the Criminal Justice System. As a subscription to the list of expectations was the following NOTICE TO PARENTS:
 If you fulfill the court's expectations, you will improve your chances of regaining or keeping guardianship of your child permanently. Failure to achieve these goals will increase that [sic] chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed for adoption.
At the commitment hearing, the court requested a copy of the next treatment plan for this child which would contain a report as to the mother's compliance with these expectations and the permanency plan if it was no longer reunification with the CT Page 1271 mother. No report was filed in December of 1994, as specifically requested, nor in the months that followed. Neither the court staff nor the child's attorney made any apparent attempt to secure the compliance of DCF with this update. DCF did, however, file a motion to extend commitment in the month when due (ordered to be filed by December 6, it was filed only three weeks late). On 1/31/96, in a hearing which Donna failed to attend despite confirmation of personal service on her, the court (Melville, J.) granted an extension of commitment to 3/6/97 and the motion of DCF to find that additional efforts to reunify mother and child were no longer appropriate. Although the study accompanying the extension petition filed on 12/27/95 failed to disclose this information, in fact Donna had given birth to a fifth out of wedlock child in February of 1995 born, as was Damien, testing positive for cocaine. No reason was offered by DCF why, ten months after the birth of this child, the department was seeking to extend Damien's commitment, rather than to free him for adoption, given such tangible proof that Donna's drug problem was not being addressed. No reason is revealed in this record, either, to explain why the court waived the 60-day hearing mandated by law following any finding that reunification efforts are no longer appropriate:
 If the court finds that such efforts are not appropriate, the Department of Children and Families shall within sixty days of such finding either (A) file a petition for the termination of parental rights, (B) file a motion to revoke the commitment and vest the custody and guardianship of the child on a permanent or long term basis in an appropriate individual or couple or (C) file a written permanency plan with the court for permanent or long term foster care, which plan shall include an explanation of the reason that neither termination of parental rights nor custody and guardianship [sic] is appropriate for the child. The court shall promptly convene a hearing for the purpose of reviewing such written plan. (Sec. 46b-129, subsection d.)
No such petition for termination or revocation was filed sixty days after the court hearing on 1/31/96. No such petition was filed after 2/23/96 when Donna was arrested and incarcerated and her new baby placed temporarily with a family friend.(Petitioner's Exh. E, p. 5.) No such petition was filed after 3/12/96 when the probate court granted custody of that baby to the family friend (Id.), nor sixty days after the effective date of the extension of commitment on 3/6/96. It was not until CT Page 1272 August of 1996 that DCF finally filed this termination petition, no reason having ever been given for the prolongation of Damien's status as a state ward. While awaiting completion of clinical evaluations and trial dates on the termination petition, DCF filed a second petition to extend commitment, which was granted by agreement to 3/6/98.
At the same time that this petition — was filed in August of 1996, Damien was moved to a specialized legal risk pre-adoptive home which was, at that time, interested in adopting him should he become freed for adoption following termination of this mother's parental rights. At the time of his placement there, Donna had been visiting regularly bi-weekly for three months, after seven months of erratic and infrequent visits. (Petitioner's Exh. E, pp. 7-8. Following reports that his behavior deteriorated after visits, becoming anxious, insecure, aggressive and oppositional, he began counseling with Dr. Michael Pines, a child psychologist. After a month, Dr. Pines recommended decreasing parental contact to monthly, at most, in order to lessen his "anxious, ambivalent, attachment problems." (Petitioner's Exh. A.) Two months later, when trial on the pending termination petition had still not been scheduled, the psychologist recommended cessation of all contact with the mother in a letter to DCF dated 3/27/97. (Petitioner's Exh. B.) This recommendation was based upon the child's.
 .". . . prolonged serious regressive episodes following any visit with his biological mother . . . including urination on the floor, verbal and physical aggression toward the foster parents and foster brother, extreme oppositionality, defiance and non-compliance. It takes several weeks to have Damien's behavior return to a stable level. . . These behavioral outbursts are exacting a significant toll on the foster parents. They are feeling fatigued, frustrated and "worn out". (Id.)
In his testimony on 7/30/97, Dr. Pines stated that Damien needed to look to one set of caregivers, whether adoptive or not, and that any contact with his mother at this stage of his life was only detrimental to him.
Dr. Augenbraun, another clinical psychologist, had evaluated mother and child in 1994 and again in 1997. In February of 1997 she found "a very troubled relationship between Damien G. and his mother . . . Damien acted out considerably and appeared very stressed when seen with his mother. . ." (Petitioner's Exh. J., CT Page 1273 Case Summary p. 1.) Three months later, the same clinician, after observing interaction between Damien and his then foster parents on May 2, 1997, found the contrast between "this interaction and that with his natural mother . . . startling." Dr. Augenbraun concluded that the foster mother was Damien's psychological parent and that ". . . Disruption of this relationship would cause Damien very significant harm." (Petitioner's Exh. K, p. 16.) Twelve days after Dr. Augenbraun made these observations, the court granted the mother's motion for at least one more visit prior to commencement of the long-delayed trial. This visit took place on 5/23/97, just three weeks after the interaction observed by Dr. Augenbraun. Four days later, the foster parents asked for him to be removed from their home. On July 1, 1997, Damien was removed from the foster family whom he regarded as his Mom and Dad, and was placed with a specialized foster home with foster parents he calls "Grandma" and Grandpa". (Testimony of Marcie Baksay.)
In the two years preceding the adjudicatory date, social workers from DCF and various agencies to which DCF referred Donna, referred her to a multiplicity of programs in the community: She was hostile and resistant to all of them, denying that she had a problem until after she was stipulated to drug treatment as a condition of her probation in March of 1996. In August of 1995 she was referred to Advanced Behavioral Management which, in turn referred her to Gunster for a drug evaluation which recommended partial hospitalization. A worker from Gunster came four times a week to drive her to appointments; she was never there. Gunster discontinued. She was referred to Intensive Family Preservation (IFP) which accepted the referral, but Donna never followed through. Sheena Harris, social worker/therapist for the IFP, met Donna in September of 1995 and agreed to work with her to obtain drug treatment, keep the baby born to her in February of 1995, and reunify with Damien. Donna did not cooperate: She was not home for scheduled visits, and, when she did keep visits, was hostile, profane and unmotivated; After two months, IFP terminated her from the program. . Donna did go to ECAR from May to November of 1996. In those six months 12 urine tests were taken; four tested positive for some kind of controlled substance. (Testimony of Astrid Reyes, ECAR coordinator.) She was then referred back to Gunster. This time, required to cooperate by the terms of her probation, she did follow through and "completed" the Gunster program. This completion consisted of attending eight sessions out of a scheduled 15; testing positive for cocaine in December of 1996 CT Page 1274 and for opiates at the time of her "discharge" from the program at the end of January, 1997. Recommended follow up was for her to attend 90 meetings in 90 days of AA or NA at Gunster. She went to none. No evidence was offered that she procured any type of follow up after her "discharge" from the Gunster program. She was also recommended for a twice weekly program at Gunster which she also did not attend. (Testimony of Thomas J. Kidder, Executive Director of Gunster Rehabilitation Services.)
Testifying on her own behalf, Donna gave a multiplicity of excuses for her nonconformity with court and agency expectations for the two years preceding institution of this action, as well as for the thirteen months between the adjudicatory and dispositional dates. For example, she excused a cocaine positive urine sample given to Gunster in December of 1996 as having been the result of her grief at the anniversary of the death of Damien's father, who died on January 8, 1992. Grief over this gentleman's demise, however, did not prevent her from getting pregnant with the child she miscarried in October of 1993, nor with the child born to her in February of 1995. She explained her failure to follow through with any of the recommendations of Gunster following her "satisfactory completion" of their abbreviated day-treatment program by stating that she was engaged in therapy. But the therapy did not start for two months after her discharge from Gunster, and had no direct relation to her primary problem of drug abuse. (Respondent's Exh. 4.) She strongly contests termination of parental rights, presumably because she believes she can care for her son (although her failure to initiate a revocation petition under Sec. 46b-129, subsection (g) for two years after Damien's commitment raises a question as to that belief), while requesting the court's permission, in a letter received on 6/23/97, to release the court ordered evaluations conducted by Dr. Augenbraun in 1994 and again in 1997. These concluded unequivocally that Donna was not now, and was not predicted to become, able to meet the needs of this troubled child and were requested to be released in order to procure disability benefits under the Social Security Act because of her alleged emotional and psychiatric problems. (See letter in court file from State of Connecticut, Bureau of Rehabilitation Services, Disability Determination Services dated June 19, 1997.) She continues to deny the ten-year drug history that several expert witness testified to, but was unable to explain delivering Damien with cocaine toxicity in 1992 if she did not start using cocaine until 1993. CT Page 1275
Adjudication — on facts as of August 19, 1996
All but one of the originally pleaded nonconsensual grounds for terminating Donna's parental rental rights were eliminated by agreement in pretrial conferences, leaving a single ground: That Donna, as a parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. [Emphasis added.] In August of 1996, Donna had been referred to a multiplicity of community programs, inpatient and outpatient, and had failed to follow through on any of them. She had given birth eighteen months earlier to another "cocaine baby", and had refused to get into any program that would have tested her for drug use subsequent to that birth. She had just started visiting regularly three months earlier, after having missed most of her permitted visits in the six months preceding May of 1996. She had no stable address or source of income, and had just started on two years probation imposed in March of 1996 for failure to appear for a drug arrest three years earlier. She had thus failed to comply with every one of the court's expectations articulated at the time of the child's original commitment. Nothing that existed in Donna's life in August of 1996 would reasonably "encourage the belief [that she]. . .could assume a responsible position in the life of the child." The petitioner has thus provided clear and convincing, if not overwhelming, proof that as of the adjudicatory date, Donna G. had failed to rehabilitate to the extent that would permit termination of her parental rights
Disposition — as of September 17, 1997
Through no fault of the respondent's, this case drifted in the system for thirteen months between its filing and the final date of hearing. It is the fault of the petitioner, however, that the child was permitted to linger in foster care limbo for more than two years longer than state and federal law required. The Adoption Assistance and Child Welfare Act of 1980 (42 U.S.C. § 672), as amended, as well as Connecticut Child Welfare laws — notably subsection (g) of Sec. 46b-129 cited above — envision a child removed for cause spending no longer than 12 months in foster care before a permanent plan is initiated unless there is a sound reason why a permanent plan is unavailable for him. CT Page 1276 Damien was removed from his mother initially in June of 1994. In June of 1995, his mother had done nothing about her drug problems and had delivered another "cocaine baby" in February of 1995. DCF did nothing to implement a permanent plan either in June of 1994 (12 months after his initial placement) or in September of 1995 (12 months after his commitment). When it finally complied with the requirements of subsection (e) of Sec. 46b-129, instead of filing a petition to terminate parental rights, it filed a petition to extend the commitment, without giving any reason why this child was doomed to remain a state ward, instead of being freed for a permanent home in adoption. DCF did succeed in securing the court's finding that further efforts to reunify mother and son, under existing circumstances, were inappropriate. But instead of filing a termination petition 60 days after this finding was entered on January 31, 1996, DCF did nothing for another seven months! During the fourteen months between when DCF could — and should — have filed to terminate Donna's parental rights, and when it finally did file, Donna's hopes for reunification stayed alive, and the child's triangulation between biological mother and foster families continued. This long continued uncertainty contributed to the child's anxiety and other appositional behavior that ultimately caused the at-risk adoptive home in which he was placed in August of 1996 to capsize less than a year later.
The unrefuted clinical evidence of two expert witnesses is unequivocal that Donna cannot now, and may never be able to, provide adequately for this troubled child. She would have to engage faithfully in a drug treatment program and produce negative urine screens for at least one year before any return could be considered. Her continuing denial of the duration and severity of her problem does not bode well for such an outcome. The foster home in which he was placed in July of 1997 has the approval of his therapist, Dr. Pines (Petitioner's Exh 3), and the necessity for ending his mother's involvement with him with finality in order to secure his best interests was made plain by Dr. Augenbraun, after having observed both mother and child and their interaction over a span of three years:
It is thus found, by clear and convincing evidence, to be in the best interests of Damien G. for his mother's parental rights to be terminated so that he may, after having spent the last two-thirds of his life in foster care with as yet no clear indication of his biological mother's lasting rehabilition, know the security of a permanent adoptive home with parents who are CT Page 1277 demonstrably capable of meeting his needs for the balance of his minority.
Seven mandatory findings:
Before an order of termination may enter, however, the court is required to consider and make written findings as to the seven matters outlined in subsection (e) of Sec. 17a-112:
1) DCF provided timely and appropriate services to Donna in an attempt to facilitate her reunification with Damien from December of 1993, when the first referral for neglect was received, until August of 1996 when this termination petition was filed. Every service in the area known to deal with drug addicted mothers was involved; none engaged Donna's full attention for more than a minimal period.
2) DCF made more than the required reasonable efforts to reunite Donna with her son. What DCF did not do is make reasonable efforts to assure this troubled child a permanent home for at least two years after the time when efforts to do so should have been commenced.
3) While not orders, the expectations spelled out by the court in September of 1994, and agreed to by Donna and her attorney, were wholly unfulfilled. Drug treatment was not consistently sought; further criminal proceedings were involved; visitation was only partially consistent. As recently as December of 1996, four months after this termination proceeding was finally initiated, Donna produced a positive cocaine test. So long as this problem remains unaddressed, her ability to parent this child cannot be assured.
4) Damien knows Donna is his mother, but regarded the foster parents with whom he lived from August of 1996 to July of 1997 as "mom and dad". His ambivalent and conflicted relationship with his biological mother was testified to by two expert clinical witnesses whose recommendations for this relationship to be severed permanently were in total agreement. On the dispositional date he had only been with his new foster family for two months, and although they were committed to him indefinitely, it was too soon to evaluate the extent of his relationship with them.
5) Damien was five years old on the dispositional date. He had not lived with his mother since he was 14 months old. Delaying CT Page 1278 permanency for this troubled child would only exacerbate his already triangulated parental ties. He needs the security of a single competent caretaking family before he heads into the challenge of full-time public school.
6) Donna has made sporadic efforts to adjust her circumstances and conduct to permit Damien to return to her care. She has maintained contact with the child to the maximum permitted, at least for the period from May of 1996 to the dispositional date. She has kept in contact with DCF. But the principal conduct which needed adjusting — her drug addiction — has been denied, minimized, trivialized with the result that no recommended treatment has ever been fully followed.
7) Donna was not prevented from maintaining a meaningful relationship with Damien by any unreasonable act of DCF. Visitation was decreased and, ultimately, suspended only on the recommendation of the clinical psychologist required to see him in therapy when his reactions to visits with his mother became so negative.
Judgment
Having found by clear and convincing proof that DCF has made reasonable efforts to reunify Damien with his mother, (even disregarding the court's determination of 1/31/96 that such efforts are not appropriate) and that grounds exist to terminate Donna's parental rights and that such termination is in Damien's best interests, it is hereby ORDERED that the parental rights of Donna G. in and to her son Damien G. be, and hereby areterminated. And it is further ORDERED that the Commissioner of DCF is appointed statutory parent for the purpose of placing the child forthwith in adoption, and to secure that end is furtherORDERED to submit to this court a written report as to the progress toward such adoption no later than sixty days after the date of this judgment. If adoption is not finalized within one year of the date of this judgment, the said Commissioner is further ORDERED file a Motion to Review Plan for Terminated Child one year following the date of this judgment, which Motion shall be docketed for no later than fifteen months following such date.
Should Donna exercise her right to appeal from this judgment, Damien's commitment shall be deemed to continue throughout the pendency of such appeal. Should such appeal result in the CT Page 1279 reversal or remand of this judgment, Damien's commitment shall be deemed to continue for a period of 90 days from the date of such reversal or remand, during which DCF is ORDERED to file a Petition to Extend Commitment immediately upon notification of such reversal or remand, which shall be docketed and acted upon within that 90 day period.
Entered at Bridgeport
This 20 day of January, 1998
Frederica S. Brenneman, Judge